UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| | | |
|---|---|---|
| RAMONA R. COPELAND, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CASE NO. 3:09-CV-431 JD |
| | ) | |
| MICHAEL J. ASTRUE, | ) | |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY | ) | |
| | ) | |
| Defendant. | ) | |

## Opinion and Order

On September 15, 2009, Plaintiff Ramona Copeland ("Copeland") filed her Complaint in

the Court. [DE 1]. On January 22, 2010, the Commissioner of Social Security

("Commissioner") filed an Answer. [DE 9]. On March 8, 2010, Copeland filed her opening

brief. [DE 16]. On June 24, 2010, the Commissioner filed a response brief. [DE 23]. Copeland

did not file a reply.

## I. Procedure

On or about June 29, 2006, Copeland filed applications for Disability Insurance Benefits

("DIB") and Supplemental Security Income ("SSI")[1], alleging disability beginning March 1,

2005, due to symptoms associated with chronic back pain and depression. (Tr. 10, 167). On

December 6, 2006, Copeland's initial applications were denied; and on April 17, 2007, her

request for reconsideration was denied. (Tr. 10). On May 15, 2007, Copeland then filed a

timely request for a hearing with an Administrative Law Judge ("ALJ"). (Tr. 110).

---

[1] The regulations governing the determination of disability for Disability Insurance Benefits are found at 20 C.F.R. § 401.1501 *et. seq.*, while the Social Security Income regulations are set forth at 20 C.F.R. § 416.901 *et. seq.* Because the definition of disability and the applicable five-step process of evaluation are identical for both DIB and SSI in all respects relevant to this case, reference will only be made to the regulations applicable to DIB for clarity.

On March 11, 2009, Copeland appeared with counsel and testified at a hearing before an ALJ. (Tr. 10). An impartial vocational expert ("VE") also appeared at the hearing. *Id.* On April 15, 2009, the ALJ found that Copeland was not disabled under the Social Security Act, concluding that she had the residual functional capacity ("RFC") to perform jobs that exist in significant numbers in the national economy. (Tr. 21).

On July 17, 2009, the Appeals Council denied Copeland's request for review, making the ALJ's decision the final decision of the Commissioner in regards to Copeland's disability claims. (Tr. 1). On September 15, 2009, Copeland filed her Complaint in the Court, pursuant to 42 U.S.C. § 405(g), alleging that the ALJ's decision was erroneous and not supported by substantial evidence. [DE 1 at 1].

## II. Facts

On March 1, 2005, the alleged onset date of her disability, Copeland was 44 years old. (Tr. 21). In 1991, Copeland was in an automobile accident for which she received treatment at St. Vincent's Pain Management Program and underwent physical therapy. (Tr. 227, 488). Thereafter, in 1994 or 1995, Copeland earned an Associate's Degree in early childhood education, during which time she was employed as a teacher's aid and bus driver with Head Start. (Tr. 31, 208). Copeland was last employed as a cashier with Village Market, a job that ended in March 2005, when she quit due to her health and the heavy lifting required by the job. (Tr. 167).

Back pain and depression are the primary underlying causes of Copeland's disability claims. (Tr. 167). Copeland has been diagnosed with arthritis of the cervical spine and lumbar spine, depression, and mild aortic insufficiency. (Tr. 12). On December 21, 2006, after Copeland filed for disability, Copeland was in a second automobile accident that she claims

increased her increased neck and back pain.  (Tr. 183).

## A.  Medical Evidence

Copeland was in an automobile accident in 1991, for which she received treatment at St. Vincent's Pain Management Program and underwent physical therapy.  (Tr. 227, 488).

On May 4, 1998, Copeland began treating with physician Dr. James Haughn.  (Tr. 401). On October 18, 1999, Copeland complained of back pain and Dr. Haughn prescribed Lortab for her pain.  (Tr. 399).  On March 2, 2001, Dr. Haughn indicated that he took an x-ray of Copeland's T-spine and LS spine, and he determined that she had osteoarthritis.  (Tr. 398, 448). Up to and through 2005, Dr. Haughn continued to treat Copeland's chronic back pain with medication, including Lortab, Skelexin, and Hydrocodone.  (Tr. 382–98).

In 2005, Dr. Haughn determined that Copeland had spinal arthritis, and he prescribed Duragesic pain patches.  (Tr. 381).  In 2005 and 2006, Copeland repeatedly reported back spasms for which Dr. Haughn continued to prescribe Duragesic medication, as well as Skelaxin. (Tr. 362–367, 371).  On January 16, 2006, Dr. Haughn indicated that he took another x-ray of Copeland's back, which showed sacralization L5 fused to S1 without disc intervening.  (Tr. 368). On January 18, 2007, Dr. Haughn noted that Copeland had back spasms, knotted muscle bundles and reduced range of motion.  (Tr. 343).  On December 20, 2007, Dr. Haughn completed a medical questionnaire wherein he determined that Copeland had not been physically able to work for the prior two years due to chronic back and neck pain and reduced range of motion. (Tr. 427–434).

In addition to treatment for back pain, Dr. Haughn has also treated Copeland for depression, which Copeland was diagnosed with in 1996 by another doctor.  (Tr. 214).  Starting in 1998, Dr. Haughn began prescribing medication for Copeland's depression.  (Tr. 401).  Since

that time, Dr. Haughn has primarily prescribed Prozac. (Tr. 369, 380, 401). In October, 2006, the Disability Determination Bureau found that Copeland's Major Depressive Disorder was in full remission and concluded that Copeland had a global assessment functioning score of 75. (Tr. 286, 300).

Copeland has also sought treatment from Richard Wells ("Wells") D.C., a chiropractor, for her chronic neck and back pain. (Tr. 228–60, 315–31). In July 2001, Wells determined that Copeland had an anatomical right leg deficiency and right lumber curvature with left spinous rotation. (Tr. 452). For this right leg deficiency, Wells prescribed a shoe lift. (Tr. 252). On May 3, 2006, Wells took x-rays and noted a decrease in Copeland's cervical and lumbar range of motion, a positive foraminal compression test at C3-C4, curvature left spinous rotation, loss of cervical lordosis and mild C5 discognisis. (Tr. 328–29). On March 7, 2007, Wells concluded that although Copeland "has not been able to return to a complete recovery, she has responded favorable [sic] to chiropractic adjustments, physiotherapy, and home exercise program." (Tr. 315).

In May 2009, Wells reviewed the x-rays he took in May 2006, and concluded that Copeland had right lumbar scoliosis, subluxations of the C1, C2 and C4 regions, subluxation in the T10-T11 region, right leg deficiency and severe subluxation of the L4 region. (Tr. 496). Wells indicated Copeland's most significant problems stemmed from alcoholism and suspected Fibromyalgia. (Tr. 496). He suggested that Copeland receive testing for Fibromyalgia and that she refrain from activities that aggravate her spine, such as yard work and household chores. (Tr. 496–97).

On March 4, 2005, Copeland was examined one time by Dr. Paolo Giacomini for purposes of Medicaid benefits. (Tr. 18, 487–93). Noting that Copeland has chronic pain, Dr.

Giacomini concluded that Copeland was unable to sustain competitive employment due to significant limitations in functioning. (Tr. 18, 491–92). Specifically, Dr. Giacomini indicated that Copeland had significant limitations when it comes to lifting, pushing/pulling, bending, squatting, crawling, climbing and reaching above shoulders. (Tr. 493).

On November 11, 2006, Copeland underwent a state agency physical consultative examination that reflected a slight symmetrical reduction in reflexes, a normal gait, full muscle strength, full ROM, negative bilateral straight leg raising, full grip strength bilaterally with retained normal fine finger function and no neurological deficits. (Tr. 302–04). On December 6, 2006, a state agency physician reviewed Copeland's record and determined that Copeland's condition was not severe. (Tr. 305). On April 13, 2007, another state agency physician affirmed the December 2006 state agency opinion. (Tr. 425).

**B. Copeland's Testimony**

Copeland said she lives with her ten-year-old child. (Tr. 32, 42). Copeland indicated that she is able to care for her personal needs (i.e. bathing and dressing) and is a licensed driver, but she also said that she does not usually drive more than an hour from home and that she could not ride in a vehicle for very long without becoming uncomfortable. (Tr. 40). Copeland testified that she can do "limited" household chores for about ten or fifteen minutes at a time. (Tr. 40-41). Copeland also said she can cook but can not lift heavy objects (Tr. 41). Copeland further testified that she infrequently sweeps or vacuums. *Id*. Copeland stated that she goes grocery shopping but usually tries to have someone else available to lift the groceries. (Tr. 42). Additionally, Copeland stated that if she goes to a movie or a restaurant, she falls asleep because of her medications. (Tr. 43). She also said that she has to take a nap just about every day. (Tr. 44-45). Copeland stated that her typical day involved getting up between 6:30 and 7:00, getting

her daughter up for school, and then drinking coffee, smoking cigarettes, watching television and taking naps.  (Tr. 45).

Copeland testified that she is unable to work because of soft tissue damage to her neck and shoulders caused by whiplash.  (Tr. 33).  Copeland specifically stated that her greatest pain is in her neck and between her shoulder blades.  (Tr. 54).  Copeland estimated that she can stand or walk for about ten minutes.  (Tr. 47).  Copeland further estimated that she can "sit for a long time" as long as she had back and neck support.  (Tr. 47).  She feels strained lifting a gallon of milk when she has not taken medications; however, when she has taken medications, she can lift up to twenty pounds but can not carry that weight very far because of pain.  (Tr. 47-48).  Copeland said she can bend, kneel, and crawl, but can not crouch for very long.  (Tr. 53-54).  Further, Copeland stated she has problems with reaching over her head.  (Tr. 460).

Copeland testified that she began taking antidepressant medications fifteen years prior to the hearing and that the dosage had been increased during the past few years.  (Tr. 34).  However, at the time of the hearing, Copeland stated that her current medication, Prozac, did not appear to be working well.  (Tr. 34).  Copeland is prescribed psychiatric medication through her family doctor, and Copeland conceded that she has not been seen for counseling for "a long time."  (Tr. 35).  Copeland said that she does not have trouble getting along with other people, but that she finds it hard to concentrate.  (Tr.  62).

## C.  Testimony of the Vocational Expert

At the hearing, the ALJ asked the VE to consider a hypothetical individual who could perform light work, lift and carry twenty pounds occasionally and ten pounds frequently; required the ability to alternate between sitting and standing; could not climb ladders, ropes, or scaffolds and could only occasionally climb ramps or stairs; could not perform overhead

reaching; had to avoid extremes of temperature and humidity, as well as concentrated exposure to environmental irritants such as fumes, odors, dust, and chemicals; and was limited to performing simple, routine, repetitive tasks. (Tr. 75). The VE testified that such an individual could perform work as a hand packager (with approximately 750 to 1,000 positions existing in the Fort Wayne regional economy); palletizer (1,000 to 1,500 positions); and garment bagger (750 positions). (Tr. 75-76). The ALJ additionally asked the VE to consider a similar individual limited to sedentary work to which the VE opined that such an individual could perform work as a waxer of glass products (400 to 500 positions); lens inserter (75 to 100 positions); and hand mounter (400 to 500 positions). (Tr. 76-77).

## D. The ALJ's Decision

The ALJ found that Copeland met the disability insured status requirements of the Act through September 30, 2007. (Tr. 12). The ALJ additionally found that Copeland had not engaged in substantial gainful activity since the onset date of her alleged disability. (Tr. 12-14). Further, the ALJ found that Copeland had the severe impairments of: allegations of residuals including whiplash, arthritis of the cervical and lumbar spine, depression resulting from two automobile accidents (one remote (1991) and one reported occurring after her alleged onset date) and mild aortic insufficiency. However, the ALJ concluded that Copeland's impairments did not, singly or in combination, meet or medically equal any of those included in the Listing of Impairments. (Tr. 12-14). *See* 20 C.F.R. pt. 404, subpt. P, app. 1.

Instead, the ALJ found that Copeland had the RFC to lift and carry twenty pounds occasionally and ten pounds frequently; she needed an option to alternate between sitting and standing; she could not climb ladders, ropes, or scaffolds and could only occasionally climb ramps or stairs; she could not perform overhead reaching; she had to avoid extremes of

temperature and humidity, as well as concentrated exposure to pulmonary irritants such as fumes, odors, dust, and gases; and she was limited to performing simple, routine, repetitive tasks. (Tr. 14). In so finding, the ALJ held that the record evidence did not support the limitations alleged by Copeland. (Tr. 20). The ALJ found at Step 4 that, given this RFC and the testimony of the VE, Copeland could not perform any past relevant work. (Tr. 20). Further, at Step 5, the ALJ found that, given this RFC and the testimony of the VE, Copeland could perform a significant number of other jobs in the economy, and was therefore not disabled. (Tr. 21-22). *See* 20 C.F.R. § 404.1520(a)(4)(v).

### III. Standard of Review

The ruling made by the ALJ becomes the final decision of the Commissioner when the Appeals Council denies review. *Liskowitz v. Astrue*, 559 F.3d 736, 739 (7th Cir. 2009). Thereafter, in its review, the district court will affirm the Commissioner's finding of fact and denial of disability benefits if they are supported by substantial evidence. *Craft v. Astrue*, 539 F.3d 668, 673 (7th Cir. 2008). Substantial evidence consists of "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). This evidence must be "more than a scintilla but may be less than a preponderance." *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007). Thus, even if "reasonable minds could differ" about the disability status of the claimant, the Court must affirm the Commissioner's decision, as long as it is adequately supported. *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008).

In this substantial-evidence determination, the Court considers the entire administrative record but does not reweigh evidence, resolve conflicts, decide questions of credibility, or substitute the Court's own judgment for that of the Commissioner. *Lopez ex rel. Lopez v.*

*Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003). Nevertheless, the Court conducts a "critical review of the evidence" before affirming the Commissioner's decision, and the decision cannot stand if it lacks evidentiary support or an adequate discussion of the issues. *Id*. Ultimately, while the ALJ is not required to address every piece of evidence or testimony presented, the ALJ must provide a "logical bridge" between the evidence and the conclusions. *Terry v. Astrue*, 580 F.3d 471, 475 (7th Cir. 2009).

Further, conclusions of law are not entitled to deference; so, if the Commissioner commits an error of law, reversal is required without regard to the volume of evidence in support of the factual findings. *Binion v. Chater*, 108 F.3d 780, 782 (7th Cir. 1997).

## IV. Analysis

Disability and supplemental insurance benefits are available only to those individuals who can establish disability under the terms of the Social Security Act. *Estok v. Apfel*, 152 F.3d 636, 638 (7th Cir. 1998). Specifically, the claimant must be unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The Social Security regulations create a five-step sequential evaluation process to be used in determining whether the claimant has established a disability. 20 C.F.R. § 404.1520(a)(4)(i)-(v). The steps are used in the following order:

1. Whether the claimant is currently engaged in substantial gainful activity;
2. Whether the claimant has a medically severe impairment;
3. Whether the claimant's impairment meets or equals one listed in the regulations;
4. Whether the claimant can still perform past relevant work; and
5. Whether the claimant can perform other work in the community.

*See Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001). At step three, if the ALJ

determines that the claimant's impairment or combination of impairments meets or equals an impairment listed in the regulations, disability is acknowledged by the Commissioner. *See* 20 C.F.R. § 404.1520(a)(4)(iii). However, if a listing is not met, in between steps three and four, the ALJ must then assess the claimant's RFC, which, in turn, is used to determine whether the claimant can perform her past work under step four and whether the claimant can perform work in society at step five. 20 C.F.R. § 404.1520(e). The claimant has the initial burden of proof in steps one through four, while the burden shifts to the Commissioner in step five to show that there are a significant number of jobs in the national economy that the claimant is capable of performing. *Young v. Barnhart*, 362 F.3d 995, 1000 (7th Cir. 2004).

Copeland's appeal focuses on the ALJ's determination that Copeland retains the requisite RFC to perform jobs which exist in significant numbers in the national economy. In particular, Copeland argues that the ALJ erred in: (1) discrediting the testimony of Copeland's treating physician, (2) discrediting Copeland's own testimony regarding the intensity, persistence, and limiting effects of her symptoms, and (3) in finding that Copeland has an RFC sufficient to maintain employment. *See* DE 16 at 7.

## A. The ALJ's decision not to afford controlling weight to the opinion of Copeland's treating physician is supported by substantial evidence in the record.

Copeland alleges the ALJ erred by giving too little weight to the opinion of her treating physician, Dr. Haughn. [DE 16 at 18]. A treating physician's opinion regarding the nature and severity of a medical condition is entitled to controlling weight if the opinion is supported by the medical findings and consistent with substantial evidence in the record. *Skarbek v. Barnhart,* 390 F.3d 500, 503 (7th Cir. 2004) (citing 20 C.F.R. § 404.1527(d)(2)). However, while the treating physician's opinion is important, it is not the final word on a claimant's disability.

*Schmidt v. Astrue*, 496 F.3d 833, 842. An ALJ, thus, may discount a treating physician's medical opinion if it is internally inconsistent or inconsistent with other evidence in the record. *Clifford v. Apfel*, 227 F.3d 863, 871 (7th Cir. 2000). Ultimately, an ALJ's decision to give lesser weight to a treating physician's opinion is afforded great deference so long as the ALJ minimally articulates her reasons for doing so. *Berger v. Astrue*, 516 F.3d 539, 545 (7th Cir. 2008). The Seventh Circuit has deemed this very deferential standard to be "lax." *Id.*

Copeland alleges the ALJ erred by giving too little weight to the opinion of her treating physician, Dr. Haughn. [DE 16 at 18]. Specifically, Copeland argues that the ALJ erred by discounting evidence of x-rays taken by Dr. Haughn and contends that there is nothing in the medical record to contradict Dr. Haughn's opinion that Copeland is disabled. [DE 16 at 16, 17]. The Court is not persuaded by either argument.

Dr. Haughn indicated, in a medical questionnaire submitted to him by Copeland's attorney dated December 20, 2007, that he believed Copeland to be unable to engage in successful gainful activity. (Tr. 426–34). In particular, Dr. Haughn checked the "yes" box when asked, "[Are] the individual's impairment(s) so severe as to prevent the individual from working not only in the person's usual occupation but also in any other substantial, gainful work considering age, education, training and work experience?" (Tr. 434). This makes up Dr. Haughn's opinion regarding Copeland's disability.

In her opinion, the ALJ stated a number of reasons why Dr. Haughn's opinion should not be afforded controlling weight. These reasons included that: Dr. Haughn's opinion was inconsistent with Copeland's daily reported activities; Dr. Haughn did not refer Copeland to an orthopedic specialist; Dr. Haughn is, himself, not an orthopedic specialist; Dr. Haughn's notes were cursory and inconsistent; Dr. Haughn's opinion lacked objective support; and there was

contradicting medical evidence in the record.[2]  (Tr. 17–19).  The Court notes that the first four of these reasons that the ALJ gave to discount Dr. Haughn's opinion have not been contested by Copeland.  Further, all of these uncontested reasons find substantial support in the record.  For example, the ALJ spoke at great length and cited numerous examples to support her finding that Copeland's daily activities were inconsistent with Dr. Haughn's opinion of total disability.  (Tr. 15–16).  In particular, the ALJ highlighted Copeland's ability, after her first auto accident, to engage in work, attain an Associate's degree, raise children, and babysit grandchildren.  (Tr. 17).  In addition, Copeland has conceded that Dr. Haughn neither referred Copeland to a specialist nor is himself a specialist.[3]

However, Copeland does challenge the ALJ's treatment of x-rays noted by Dr. Haughn's in his treatment records.[4]  Specifically, Copeland alleges that the ALJ erred by not considering

---

[2] Another reason the ALJ gave for discounting Dr. Haughn's opinion is that his opinion was found to be internally inconsistent.  (Tr. 18, 429).  The ALJ refers to question six in a medical questionnaire, which reads, "[i]s the individual's ability to stand and/or walk affected by the impairment?" (Tr. 429).  Dr. Haughn checked "No" but then indicated within the very same question that Copeland's condition limits her to one hour of standing and one half hour of walking.  *Id.*  While these two responses are technically inconsistent, the Court wonders whether this was a clerical error indicative of haste, carelessness, or accident by Dr. Haughn, and not an internal inconsistency for which the doctor's medical opinion is more properly discredited.  However, because the ALJ properly discounted Dr. Haughn's opinion with other evidence in the record, and because Copeland has not challenged this inconsistency as a scrivener's error, the ALJ's finding of an internal inconsistency in Dr. Haughn's opinion does not amount to reversible error.

[3] Copeland argues that the ALJ erred by making an "assumption that [Copeland]'s impairments did not warrant medical referrals."  [DE 16 at 17].  The Court construes Copeland's argument to be that the ALJ was impermissibly playing doctor.  It is well established that an ALJ may not "play doctor" by making her own independent medical findings.  *Clifford v. Apfel*, 227 F.3d 863, 870 (7th Cir. 2000).  However, the ALJ did not play doctor by concluding that Copeland should not be referred.  Instead, the ALJ noted that despite ten years of treatment by Dr. Haughn, Dr. Haughn never referred Copeland to a specialist.  (Tr. 18).  It was not the ALJ's opinion that Copeland should not be referred to a specialist; instead, the ALJ made a factual statement indicating that Dr. Haughn never referred Copeland to a specialist.  This is a fact that the ALJ found to be inconsistent with the severity of Dr. Haughn's opinion regarding Copeland's RFC.  Therefore, the Court finds no merit in this argument.

[4] The Court notes that Copeland similarly challenges the ALJ's treatment of x-rays taken by Copeland's chiropractor, Richard Wells.  [DE 16 at 17].  However, Copeland does not challenge that the ALJ impermissibly discounted Wells' opinion.  Further, the ALJ noted that chiropractors are not considered to be acceptable medical sources but, instead, are considered as "other sources."  (Tr. 19) (citing 20 C.F.R. § 404.1513).  The ALJ further noted that Copeland's chiropractor did not find Copeland to be completely disabled.  *Id.*  Additionally, there are no x-rays from Wells in the record.  As such, the Court need only discuss x-rays as they pertain to Dr. Haughn's opinion.  Regardless, the analysis is the same in that the ALJ properly considered evidence of x-rays, despite

certain x-rays to be part of the medical record. [DE 16 at 17–18]. The Court finds no merit in this argument. To begin, Copeland previously acknowledged that no x-rays or x-ray reports were in the record. (Tr. 444). Noting the absence of such objective evidence, the ALJ left the record open for two weeks after the hearing so that Copeland could submit x-rays for the record. (Tr. 39–40, 79). Nevertheless, Copeland did not submit any x-rays or x-ray reports.[5] Instead, one week after the administrative hearing, Copeland's attorney conceded the nonexistence of x-ray reports by stating in a letter sent to the ALJ, "[p]lease by advised that these x-rays were taken at . . . Dr. Haughn's office and no formal written reports were created. The x-ray and/or x-ray results were simply noted within the physician['s] notes." (Tr. 444). Additionally, the letter from Copeland's counsel indicated that all evidence of x-rays was already contained in the record in the form of Dr. Haughn's notations. *Id.* Consequently, because the evidence shows that only notes of x-rays were in the record, the ALJ cannot be said to have erred in concluding that there were no supporting x-rays or x-ray reports in the record.

In addition, despite this conceded evidentiary deficiency, the ALJ did not completely disregard the existence of x-rays nor did the ALJ fail to discuss the x-rays within the context of her discussion of the medical evidence in the record. For example, the ALJ indicated that Dr. Haughn made mention of x-rays, not in evidence, on January 16, 2006 showing sacralization L5 fused to S1 with disc intervening. (Tr. 18). Further, the ALJ, acknowledged that both Dr. Haughn and Copeland's chiropractor made notations in their records regarding x-rays. *Id.* However, the ALJ opined that, not withstanding notations in Dr. Haughn's treatment records,

Copeland's assertion to the contrary.

[5] The record does contain one actual x-ray report, made March 1, 2007, but the Court notes this was an x-ray for chest pain and is completely unrelated to Copeland's back and neck problems. (Tr. 423). Further, this x-ray report favorably indicates that Copeland has no acute cardiopulmonary disease. *Id.*

"no x-ray *reports* are evidenced within the medical record, which conspicuous absence o[f] x-ray *reports* makes questionable the existence of such x-rays." (Tr. 18) (emphasis added).

Admittedly, the Court find's some of the ALJ's comments regarding the x-rays in question to be puzzling. In particular, the Court questions why the ALJ focused so much on whether the x-rays actually existed. (Tr. 18). Given the fact that Dr. Haughn's treatment records do indicate that he took x-rays, it is not clear if the ALJ is questioning if x-rays were ever taken, or if the ALJ is somehow questioning the credibility of Dr. Haughn's medical records and opinion. However, the Court finds no reversible error on the part of the ALJ. In particular, what is clear to the Court is that, despite the peculiar statement regarding the existence of x-rays, the ALJ did not misstate the record regarding the general absence of x-rays and x-ray reports. Further, the ALJ still considered Dr. Haughn's discussion of the x-rays in her opinion, albeit with an apparent concern regarding the veracity of Dr. Haughn's conclusions in the absence of objective evidence verifying the same. *See Rice v. Barnhart,* 384 F.3d 363, 371 (7th Cir. 2004) (stating that an ALJ need only minimally articulate his justification for accepting or rejecting specific evidence of disability); *Lopez v. Barnhart,* 336 F.3d 535, 539 (7th Cir. 2003) (stating that in a substantial evidence determination, the Court will not reweigh evidence). Finally, the Court notes that the ALJ's discussion of the x-rays comes amid several other independent and substantially supported reasons that the ALJ asserted for giving less weight to Dr. Haughn's opinion, including that Dr. Haughn is not an orthopedic specialist, he did not refer Copeland to an orthopedic specialist, his notes were cursory and his opinion was contradicted by Copeland's reported daily activities. For these reasons, the ALJ did not error in her consideration of the x-rays noted in Dr. Haughn's medical records.

Next, Copeland also argues that there is nothing in the medical records to contradict Dr.

Haughn's opinion that Copeland is disabled. The Court also finds no merit in this argument. As stated above, the ALJ mentioned several well-supported and sufficiently articulated reasons for discounting Dr. Haughn's opinion, including: that Dr. Haughn did not refer Copeland to a specialist; that Dr. Haughn is not a specialist; and that his treatment notes were cursory. In addition, the ALJ noted that Copeland's daily activities contradicted a finding of complete disability. (Tr. 20). Beyond these reasons, the ALJ noted that the consultative examination contained in the record and the opinions therein were contradicting medical evidence. Specifically, the ALJ additionally noted that, on November 11, 2006, Copeland underwent a state agency physical consultative examination which reflected only a slight symmetrical reduction in reflexes, a normal gait, full muscle strength, full ROM, negative bilateral straight leg raising, full grip strength bilaterally with retained normal fine finger function and no neurological deficits. (Tr. 18, 302–04). Further, the ALJ noted that, on December 6, 2006, a state agency examining physician indicated that Copeland did not have a severe disability, in sharp contrast to the conclusions of Dr. Haughn.[6] (Tr. 305). As such, contrary to Copeland's assertion that there is no contradicting medical evidence in the record, the Court considers the ALJ to have provided numerous examples of contradicting evidence in the record, sufficient to discount Dr. Haughn's opinion and, therefore, considers the ALJ to have acted well within her discretion when she discounted Dr. Haughn's opinion due to contradicting evidence in the record and contradicting medical evidence and opinions by the state agency physicians. *See Clifford v. Apfel,* 227 F.3d 863, 871 (7th Cir. 2000) (stating an ALJ may discount a treating physician's medical opinion if it is inconsistent with other evidence in the record); *see also Schmidt*, 496

---

[6] The Court notes that Wells, Copeland's chiropractor, also did not find Copeland to be completely disabled. (Tr. 497).

F.3d at 842 (highlighting that an ALJ may discount a treating physician's opinion when it is contradicted by a consulting physician's opinion).

The Court will not overturn an ALJ's decision where it is supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). The ALJ provided such relevant evidence when she limited the weight afforded to Dr. Haughn's medical opinion, stated in a medical questionnaire, that Copeland is completely disabled. Indeed, the ALJ's numerous, cited reasons for discounting Dr. Haughn's opinion are all supported in the record evidence and sufficiently articulated by the ALJ. Furthermore, the ALJ's discussion of the lack of x-rays and the contradicting evidence and opinions of the state agency physicians were not in error. Consequently, the Court finds the ALJ's decision to not afford the opinion of Copeland's treating physician controlling weight to be supported by substantial evidence in the record.[7]

Nevertheless, once the ALJ articulates reasons for rejecting the treating physician's opinion, the ALJ must still determine what weight the physician's opinion is due under the applicable regulations. *Larson v. Astrue*, 615 F.3d 744, 751 (7th Cir. 2010). *See* 20 C.F.R. § 404.1527(d)(2). Factors the ALJ should consider when determining the weight to give the treating physician's opinion include the length of treatment and frequency of examination,

---

[7] The Court additionally notes one other opinion in the record regarding Copeland's alleged disability. Dr. Paolo Giacomini, a consultative physician who assessed Copeland for the purposes of Medicaid benefits, similarly opined that, "I don't think that presently she could be employed in a serious situation." *See* Tr. 492. However, the ALJ discredited the opinion based on the lack of objective findings, the cursory nature of the single examination, the contradictory notes in the same report showing no musculoskeletal deficits, and the appearance that the opinion was based solely on Copeland's subjective complaints. *See* Tr. 9. Copeland does not contest the ALJ's treatment of Dr. Giacomini's opinion. Further, having identified several inconsistencies in Dr. Giacomini's opinion, the Court considers the ALJ to have provided sufficient articulation and adequate reasons for discounting the opinion. *Clifford v. Apfel*, 227 F.3d 863, 871 (7th Cir. 2000) (An ALJ may discount a treating physician's medical opinion if it is internally inconsistent or inconsistent with other evidence in the record); *Berger v. Astrue*, 516 F.3d 539, 545 (7th Cir. 2008) (An ALJ's decision to give lesser weight to a treating physician's opinion is afforded great deference so long as the ALJ minimally articulates her reasons for doing so).

whether the physician supported his opinion with sufficient explanations, the extent to which the treating physician presents relevant evidence to support his opinion, whether the physician specializes in the medical conditions at issue, and the consistency of the opinion. *See Hofslien v. Barnhart*, 439 F.3d 375, 377 (7th Cir. 2006); *Elder v. Astrue*, 529 F.3d 408, 415-16 (7th Cir. 2008); 20 C.F.R. § 404.1527(d)(2).

In this regard, the Court finds that the ALJ also adequately considered the factors established in 20 C.F.R. 404.1527(d)(2), when determining how much weight to give Dr. Haughn's opinion. In particular, the Court notes that the ALJ gave Dr. Haughn's opinion little weight for the same reasons that the ALJ rejected Dr. Haughn's opinion as controlling. The ALJ recognized that Dr. Haughn has been treating Copeland since 1998 but additionally noted that Dr. Haughn is not an orthopedic specialist and never referred Copeland to an orthopedic specialist during the ten years that he treated Copeland. (Tr. 17-18). Further, the ALJ indicated that she found Dr. Haughn's 2007 opinion, that Copeland has been completely disabled since 2005, to be uncorroborated by Dr. Haughn's own cursory medical records and Dr. Haughn's lack of referral to a specialist. (Tr. 17, 18). Consequently, it appears that the ALJ appropriately considered and sufficiently discussed what ultimate weight to give Dr. Haughn's opinion, consistent with the factors articulated in 20 C.F.R. § 404.1527(d)(2). *Compare Elder v. Astrue*, 529 F.3d 408, 415-16 (7th Cir. 2008). Further, the Court finds that the ALJ's discussion, in this regard, to be substantially supported by record evidence.

**B.  The ALJ did not error in her finding that Copeland's statements concerning the intensity, persistence, and limiting effects of her symptoms were less than credible.**

Next, Copeland challenges the ALJ's finding that Copeland's statements concerning the intensity, persistence and limiting effects of her symptoms were not fully credible. [DE 16 at

14].  Because the ALJ is in the best position to observe witnesses, an ALJ's credibility determination will not be upset on appeal so long as it finds some support in the record and is not patently wrong.  *Herron v. Shalala,* 19 F.3d 329, 335 (7th Cir. 1995).  Indeed, "[o]nly if the trier of facts grounds his credibility finding in an observation or argument that is unreasonable or unsupported . . . can the finding be reversed."  *Prochaska v. Barnhart,* 454 F.3d 731, 738 (7th Cir. 2006).  However, as a bottom line, SSR 96-7p requires an ALJ to consider the entire case record and articulate specific reasons to support his credibility finding.  *Golembiewski v. Barnhart,* 322 F.3d 912, 915 (7th Cir. 2003).  Further, while an ALJ is not required to provide a complete written evaluation of every piece of testimony and evidence, an ALJ cannot simply state that an individual's allegations have been considered or that the individual's allegations are not credible.  *Rice v. Barnhart,* 384 F.3d 363, 370  (7th Cir. 2004); SSR 96-7p.

The process for evaluating a claimant's symptoms is organized around two major steps. First, the claimant must provide objective medical evidence of a medically determinable impairment or combination of impairments that reasonably could be expected to produce the alleged symptoms.  20 C.F.R. § 416.929(a)-(b).  In Copeland's case, the ALJ found that the claimant's medically determinable impairments could reasonably be expected to cause Copeland's alleged symptoms.  (Tr. 16).

Second, after the first step is satisfied by the claimant, the ALJ must then evaluate the intensity, persistence, and limiting effects of the individual's symptoms to determine the extent to which the symptoms limit the individual's ability to do basic work activities.  20 C.F.R. § 416.929(a).  While an ALJ may not reject subjective complaints of pain solely because they are not fully supported by medical testimony, the ALJ may consider that as probative of the claimant's credibility.  *Powers v. Apfel,* 207 F.3d 431, 435 (7th Cir.2000); SSR 96-7p.  The

regulations identify seven examples of the kinds of evidences the ALJ considers, in addition to objective medical evidence, when assessing the credibility of an individual's statements:

> (1) the individual's daily activities; (2) the location, duration, frequency, and intensity of the individual's pain or other symptoms; (3) factors that precipitate and aggravate the symptoms; (4) the type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms; (5) treatment, other than medication, the individual receives or has received for relief of pain or other symptoms; (6) any measures other than treatment the individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board); (7) any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.

20 C.F.R. 416.929(c); SSR 96-7p. The ALJ need not mechanically recite findings on each factor, but must give specific reasons for the weight given to the individual's statements. *Ware v. Apfel*, 2000 WL 1707942 (S.D. Ind. 2000); SSR 96-7p.

Copeland broadly argues that the ALJ failed to consider the types of evidence set forth in 20 C.F.R. § 416.929. [DE 16 at 14]. Reviewing the ALJ's opinion, the Court concludes that, contrary to this naked assertion, the ALJ more than adequately considered the evidence of record and gave specific reasons for the weight she gave to Copeland's statements.

In making her credibility finding, the ALJ cited many of the types of evidence indicated in 20 C.F.R. § 416.929. For example, in regards to Copeland's alleged physical limitations, the ALJ noted that there was no objective medical evidence to substantiate Copeland's statements in the record and that side effects were actually denied by Copeland, despite Copeland's claim that the side effects of her medication resulted in sleepiness and frequent falls. (Tr. 16). In addition, the ALJ noted a number of activities that she considered inconsistent with the alleged severity of Copeland's impairments. For instance, the ALJ noted that Copeland's symptoms have been long-standing, going back to 1991, and allegedly include difficulty in lifting a gallon of milk and

the inability to engage in prolonged standing or sitting. (Tr. 17). However, despite these alleged limitations the ALJ observed that Copeland had engaged in substantial gainful activity until 2005, well after her 1991 automobile accident from which her pain initially derived. (Tr. 17, 20). Similarly, the ALJ noted that after Copeland's 1991 accident, Copeland attained an Associate's Degree. (Tr. 17, 20). Further, the ALJ found that Copeland had been prescribed pain medication from Dr. Haughn from as early as 2001; and that, despite Copeland's pain, she was employed until 2005. (Tr. 17). The ALJ also highlighted that Copeland is currently attending to the care and needs of a friend with whom she lives. (Tr. 17, 20). From this, it is evident to the Court that the ALJ properly considered and discussed the types of evidence required by the regulations, as part of the ALJ's decision to discount the credibility of Copeland's testimony.

Similarly, in regards to Copeland's alleged mental limitations, the ALJ noted that, despite Copeland's long-standing depression, Copeland has not undergone mental health treatment or counseling. (Tr. 17, 20). In addition, the ALJ affirmed that, despite depression, Copeland was able to work, raise children, babysit and attain an Associate's Degree. (Tr. 17). The ALJ also recognized that Copeland's depression was treated and improved with medication, an evaluation confirmed by a state agency psychological examination that showed Copeland had no more than mild limitations regarding her mental health and that her depression was in full remission. (Tr. 17, 20).

Given the ALJ's thorough discussion of the record evidence and the numerous well-supported reasons that the ALJ provided for discounting Copeland's credibility, the Court finds that the ALJ more than adequately discussed the credibility determination and supported the same with ample evidence in the record. Accordingly, the ALJ did not error in her credibility

determination of Copeland's testimony.

## C. The ALJ did not error when determining Copeland's Residual Functional Capacity.

Finally, Copeland argues that the ALJ erred in establishing Copeland's residual functioning capacity. [DE 16 at 16]. The ALJ has final responsibility for deciding a claimant's residual functional capacity, which is a legal decision rather than a medical one. *See* 20 C.F.R. §§ 404.1546(c), 404.1527(e). A reviewing court is not to substitute its own opinion for that of the ALJ's or to re-weigh the evidence, but the ALJ must build a logical bridge from the evidence to his conclusion. *Haynes v. Barnhart,* 416 F.3d 621, 626 (7th Cir. 2005). An ALJ's decision cannot stand if it lacks evidentiary support or an adequate discussion of the issues. *Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003). An ALJ must evaluate both the evidence favoring the claimant as well as the evidence favoring the claim's rejection and may not ignore an entire line of evidence that is contrary to his findings. *Zurawski v. Halter*, 245 F.3d 881, 887 (7th Cir. 2001). However, an ALJ need not provide a written evaluation of every piece of testimony and evidence. *Diaz v. Chater*, 55 F.3d 300, 308 (7th Cir. 1995). An ALJ need only minimally articulate his justification for accepting or rejecting specific evidence of disability. *Rice v. Barnhart*, 384 F.3d 363, 371 (7th Cir. 2004).

The ALJ found that Copeland had the RFC requisite to perform light work with restrictions. (Tr. 14). Copeland asserts that there is simply no evidence in the record to support the ALJ's RFC determination. [DE 16 at 16]. The Court, however, finds that the ALJ cited ample, well-articulated evidentiary support for the determination that Copeland has the RFC to perform light work. To begin, the ALJ spent a full six pages of her order examining the record evidence in relation to Copeland's RFC determination. (Tr. 14–20). The ALJ spent a full three pages of the same examining and weighing the medical evidence. (Tr. 18–20). As discussed

previously, the ALJ noted that, despite Dr. Haughn's finding of disability for Copeland, there was contradicting medical evidence that showed Copeland had only a slight symmetrical reduction in reflexes and had a normal gait, full muscle strength, full ROM, negative bilateral straight leg raising, no neurological deficits and full grip strength bilaterally with retained normal fine finger function. (Tr. 18). In addition to reviewing the medical evidence, the ALJ noted Copeland's extensive daily activities and Copeland's testimony that she is able to attend to her own personal and self-care needs. (Tr. 15). Further, the ALJ placed particular emphasis on the fact that Copeland engaged in SGA long after her first automobile accident and that she also earned an Associate's degree after her 1991 accident, the alleged origins of her claimed disability. (Tr. 17). From this thorough discussion and analysis, the ALJ reasonably concluded that Copeland retained the RFC to do light work. *See Terry v. Astrue,* 580 F.3d 471, 475 (7th Cir. 2009) ("The ALJ is not required to address every piece of evidence or testimony presented, but must provide a 'logical bridge' between the evidence and his conclusions."). However, the ALJ's careful consideration of the evidence did not stop there.

Instead, the ALJ's careful consideration of the evidence of record is further demonstrated by the ALJ's specifically tailored exceptions to Copeland's ability to perform light work. For example, rather than simply concluding that Copeland was capable of performing all light work, the ALJ cited Copeland's long history of chronic sinus complaints and restricted Copeland's RFC so as not to include concentrated exposure to pulmonary irritants such as fumes, odors, dusts and gases. (Tr. 14, 20). Similarly, the ALJ precluded prolonged standing, walking and heavy lifting, indicating such additional exceptions to be supported by Dr. Haughn's treatment records. (Tr. 19).

The Court finds that the ALJ's thorough discussion of the record evidence in regards to

Copeland's RFC determination to be well-articulated and more than adequately supported by evidence in the record.

**D.  The ALJ erred when making her Step Five determination by failing to clearly include Terry's moderate difficulties in maintaining concentration, persistence, and pace as part of her hypotheticals to the Vocational Expert.**

Despite the Court's conclusion that remand is not required for the reasons stated by Copeland, the Court notes that the ALJ failed to clearly articulate Terry's identified difficulties in maintaining concentration, persistence, and pace to the Vocational Expert at Step 5.[8] Consequently, remand for that narrow purpose is appropriate.

As the Seventh Circuit explained in *O'Connor-Spinner v. Astrue*, when providing hypotheticals to a Vocational Expert for the purpose of determining a claimant's ability to perform other jobs in the community, the ALJ must generally orient the Vocational Expert to the claimant's limitations, particularly in relation to any credible limitations in the claimant's concentration, persistence, and pace.  *See O'Connor-Spinner v. Astrue*, 627 F.3d 614, 619-21 (7th Cir. 2010). While the Seventh Circuit has stopped short of requiring an ALJ to always specify a claimant's limitations in concentration, persistence and pace when soliciting Vocational Expert testimony; in the absence of such exact articulation, the record must indicate that the Vocational Expert was aware of the limitation and was permitted to testify with

---

[8] The ALJ's other findings regarding the severity of Copeland's non-exertional impairments were sufficiently accounted for by the ALJ.  First, the ALJ additionally found moderate limitations in Copeland's activities of daily living. *See* Tr. 13.  However, the ALJ explained that such deficits were the result of physical rather than mental limitations.  *Id.*  This explanation, along with the ALJ's subsequent discussion of the precise limiting effects of Copeland's daily living (Tr. 15-16), reveal that this limitation was properly accounted for in the ALJ's RFC limitation to light work with a sit-stand option.  Further, the ALJ also found only mild limitations in social functioning.  *See* Tr. 14.  In so concluding, the ALJ noted Copeland's testimony that she did not have problems getting along with the supervisors.  *Id.*  However, the ALJ noted Copeland's testimony that she has trouble getting along with the public; but the ALJ adequately distinguished Copeland's testimony based on her daily activities and additionally noted that the jobs cited by the VE did not require working with the public. *Id.*  As such, this limitation was also properly accounted for by the ALJ. Consequently, remand is not necessary in relation to the ALJ's consideration and discussion of these other non-exertional limitations.

consideration of the same. *See O'Conner-Spinner v. Astrue*, 627 F.3d 614, 619-21 (7th Cir. 2010) (noting exceptions when: it is clear that the Vocational Expert was apprised of the limitation, either through review of the record or through observation at the hearing, and the Vocational Expert was permitted to take the limitation into consideration when responding to the ALJ's questions, or when the RFC clearly accommodates such limitations based on etiology). In cases, such as this one, however, where a Vocational Expert hears testimony regarding a claimant's limitations but the ALJ poses a series of increasingly restrictive hypotheticals to the Vocational Expert at Step 5, disclosure of deficiencies in the claimant's concentration, persistence, and pace will almost always need to be included in the ALJ's hypotheticals. *O'Conner-Spinner*, 627 F.3d at 619 ("[I]n such cases we infer that the VE's attention is focused on the hypotheticals and not on the record.").

Here, the ALJ found that Copeland has moderate difficulties with regard to concentration, persistence or pace and that Copeland's reported mental health function and consistent complaints of pain likely result in some limitation in her ability to maintain concentration, persistence or pace. (Tr. 13, 20). However, while it appears that the Vocational Expert may have been aware of Copeland's limitations in concentration, persistence and pace through observation of testimony presented at the hearing, it is not clear that the Vocational Expert was permitted to take Copeland's actual deficiencies in concentration persistence, and pace into account when responding to the ALJ's narrow hypotheticals. *See* Tr. 48-77.

Consequently, in accordance with *O-Connor-Spinner*, the Court considers remand to be appropriate in order to permit the ALJ an opportunity to resubmit hypotheticals to the Vocational Expert which clearly incorporate Copeland's credible limitations in concentration, persistence and pace, complying with the requirement that the Vocational Expert be fully oriented and

permitted to testify regarding Copeland's limitations in concentration, persistence, and pace at Step 5 of the analysis. *See O'Conner-Spinner*, 627 F.3d at 619-21.

## V. Conclusion

For the foregoing reasons, the Court **GRANTS** Copeland's motion to remand the ALJ's decision, [DE 1]. Accordingly, the Court now **REMANDS** this case for further consideration by the ALJ, consistent with the conclusions in this opinion and order.

SO ORDERED.

ENTERED: March 1, 2011

_____/s/ JON E. DEGUILIO_____
Judge
United States District Court